2016 OK 121

**Larry A. BURNS, D.O., on behalf of himself and his patients, Plaintiff/Appellant,**

v.

**Terry L. CLINE, in his official capacity as Oklahoma Commissioner of Health, Carl B. Pettigrew, D.O., in his official capacity as President of the Oklahoma State Board of Osteopathic Examiners, and Greg Mashburn, in his official capacity as District Attorney for Cleveland, Garvin and McClain Counties, Defendants/Appellees.**

**Case Number: 114807**

Supreme Court of Oklahoma.

Decided: 12/13/2016

**350**

J. Blake Patton, Oklahoma City, Oklahoma, for Appellant

Martha M. Hardwick, Pauls Valley, Oklahoma, for Appellant

Genevieve Scott, New York, New York, for Appellant

Sarah A. Greenwalt, Office of the Attorney General, Oklahoma City, Oklahoma, for Appellees

M. Daniel Weitman, Office of the Attorney General, Oklahoma City, Oklahoma, for Appellees

WATT, J.:

¶ 1 This Court has been asked to consider the constitutionality of SB 1848, passed by the Legislature and signed into law by the Governor on May 28, 2014. The effective date of the legislation was November 1, 2014. This legislation contains one section with twelve separate and *unrelated* sub-sections, A to L. Under the guise of the protection of women's health, SB 1848 requires an abortion facility to have a physician on premises who *also has hospital admission privileges within thirty*

*miles* of the facility, on any day an abortion is performed.[1] We reverse the district court's findings and hold the statute unconstitutional because it creates an undue burden on a woman's access to abortion, violating protected rights under our federal Constitution, *Whole Woman's Health v. Hellerstedt*, ("Hellerstedt"), 579 U.S. ——, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016) and also under the Oklahoma single subject rule, Okla. Const. art. 5, 57.

## STANDARD OF REVIEW

¶ 2 We have authority to address the constitutionality of SB 1848 and acknowledge the heavy burden placed on those who raise constitutional challenges to legislation. *Douglas v. Cox Retirement Properties, Inc.*, 2013 OK 37, 302 P.3d 789. This Court favors a statutory construction that upholds the constitutionality of a statute. *Oliver v. Hofmeister*, 2016 OK 15, 368 P.3d 1270. However, all legislation is subject to constitutional and statutory limits. It is the duty of this Court to impartially review legislation and determine whether a statute conflicts with the Oklahoma Constitution, *Burns v. Cline*, 2016 OK 99, 382 P.3d 1048, or the federal Constitution, the highest law of this land. *In re Initiative Petition No. 349, State Question 642*, 1992 OK 122, 838 P.2d 1.

## PROCEDURAL HISTORY

¶ 3 Burns appeals from the trial court's order (1) denying Burns' motion for partial summary judgment and (2) granting defendants' motion for summary judgment thereby denying all of Burns' requested declaratory and injunctive relief. This matter originates from Burns' petitioning the district court to declare SB 1848 void, asserting it violates the Oklahoma Constitution, and to permanently enjoin the State from enforcing the legislation.[2] Burns' concurrent request for immediate temporary injunctive relief

1. SB 1848 provides at Section 1 (B) as follows: On any day when any abortion is performed in a facility providing abortions, a physician with admitting privileges at a general medical surgical hospital which offers obstetrical or gynecological care in this state within thirty (30) miles of where the abortion is being performed must remain on the premises of the facility to facilitate the trans-

fer of emergency cases of hospitalization of an abortion patient or a child born alive is necessary and until all abortion patients are stable and ready to leave the recovery room.

2. Verified Petition, CV-2014–1896, District Court of Oklahoma County, State of Oklahoma.

was denied by the trial court. By a separate and prior appeal, Burns sought interlocutory relief from this Court. On November 4, 2014, this Court issued a Memorandum Opinion and "temporarily enjoin[ed] enforcement of [SB 1848] until the constitutionality of [SB 1848] is fully and finally litigated".[3] The stay remains in effect.[4]

## ANALYSIS

## FEDERAL DUE PROCESS AND ABORTION

■ ¶4 Burns identified multiple Oklahoma state constitutional challenges to SB 1848 in his district court petition. Before addressing the various state constitutional arguments of Burns and defendants, we must first acknowledge that SB 1848 is fatally flawed legislation under our federal Constitution and the recent pronouncements in *Hellerstedt, supra.*

■ ¶5 Decisions from the United States Supreme Court are binding on this Court and require us to promulgate rules of law consistent with the federal Constitution. *United States v. Home Fed. S. & L. Ass'n of Tulsa,* 1966 OK 135, 418 P.2d 319, 325, *Burns, supra.* Where the United States Supreme Court has spoken, this Court is bound by its pronouncements. The Supremacy Clause of the United States Const. art. VI, cl. 2 provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; *and the Judges in every State shall be bound thereby, any Thing in the Constitution of any State to the Contrary notwithstanding*" (Emphasis added).

¶6 Furthermore, Okla. Const. Art. 1, 1 mandates that the Legislature and this Court comply with federal constitutional law on issues of federal law, stating:

The State of Oklahoma is an inseparable part of the Federal Union, and the Constitution of the United States is the supreme law of the land.

■ ¶7 It is mandatory that we uphold and comply with the highest law of this land. *In re Initiative Petition No. 349, State Question 642,* 1992 OK 122, 838 P.2d 1, 7. The limited role of this Court as with all state courts, "is to apply federal constitutional law, not to make it nor to guess what it may become. By virtue of our constitutional oath of office, we have solemnly sworn to uphold the Constitution of the United States." *Id.* (footnotes omitted).

■ ¶8 Every woman in this country has a constitutionally protected right to choose whether to terminate her pregnancy before viability.[5] This right is protected from undue interference from the State.[6] Although the State has a legitimate interest in protecting the health of a woman, legislation may be found unconstitutional where the purpose or effect creates an undue burden or obstacle to a woman seeking a lawful abortion.[7] The United States Supreme Court has been clear that "[u]nnecessary health regulations that have the purpose or effect of presenting a

---

3. *Burns v. Cline,* 2014 OK 91, 339 P.3d 887, Memorandum Opinion.

4. Both parties cite to two different *district court decisions that were never appealed and are unpublished.* Because unpublished opinions from *this* court "are deemed to be without value as precedent and are not uniformly available to all parties, opinions so marked shall not be considered as precedent *by any court or cited in any brief or other material presented to any court, except to support a claim of res judicata, collateral estoppel, or law of the case".* (Emphasis added), Okla. Sup. Ct. R. 1.200 (c) Supp. 2014, Ch. 15, App.1. In a rare instance, a party may cite to an *unpublished opinion from this Court of the Court of Civil Appeals* and *only* in the very limited circumstances as outlined in this rule. The parties cited to *unpublished district court judgments* in violation of Rule 1.200 (c). While this Court recognizes that the parties are duty bound to serve as zealous advocates, counsel are reminded such advocacy must be done within the bounds of the Oklahoma Supreme Court Rules. Okla. Sup. Ct. R. 1.1–1.506, 2011, Ch. 15, App.1.

5. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and as re-affirmed by *Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

6. *Id.*

7. *Casey,* 505 U.S. at 878, 112 S.Ct. at 2821.

substantial obstacle to a woman seeking an abortion impose an undue burden on that right."[8]

■ ¶ 9 The *Hellerstedt* court recently reexamined these principles as applied to a provision in a Texas abortion statute that is substantively identical to SB 1848. A "State has a legitimate interest in seeing to it that abortion ... is performed under circumstances that insure maximum safety for the patient." *Roe v. Wade*, 410 U.S. at 150, 93 S.Ct. at 725. However, "a statute which while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Casey*, 505 U.S. at 877, 112 S.Ct. at 2820, 120 L.Ed.2d at 674.

¶ 10 The Texas law examined in *Hellerstedt* had two offending provisions: 1) the "admitting privileges requirement", wherein physicians performing abortions were mandated to have active admitting-privileges at a hospital that was no more than 30 miles from the abortion facility, and 2) the "surgical center requirement", wherein abortion facilities had to meet minimum standards set for an ambulatory surgical center. *Hellerstedt, supra*. Each of these provisions were independently found to be unconstitutional. The provision relevant to the analysis of SB 1848, is the "admitting privileges requirement", which contains the same offending language as found in *Hellerstedt*.

¶ 11 Following the effective date of the Texas legislation at issue, the number of abortion facilities in that state dropped by half. The *Hellerstedt* court found that such a reduction created a significant burden on the right of women seeking abortion, affecting a woman's protected right to abortion prior to viability. Texas argued this new law satisfied federal constitutional principles because it advanced a legitimate state interest, to improve the safety of women seeking abortion. This argument fell flat in light of the record

evidence consisting of *national* peer review studies and expert testimony. The Court concluded there was no significant health-related problem that the new law helped to cure.

¶ 12 In reaching this conclusion, the *Hellerstedt* court noted the evidence relied on included the following:

"A collection of at least five peer-reviewed studies on abortion complications in the first trimester, showing that the highest rate of major complications-including those complications requiring hospital admission was less than one-quarter of 1%. (citation to record omitted)

Figures in three peer-reviewed studies showing that the highest complication rate found for the much rare second trimester abortion was less than one-half of 1% (0.45% or about 1 out of about 200). (citation to record omitted)

Expert testimony to the effect that complications rarely require hospital admission, much less immediate transfer to a hospital from an outpatient clinic.[9]

Expert testimony stating that 'it is extremely unlikely that a patient will experience a serious complication at the clinic that requires emergent hospitalization' and 'in the rare case in which [one does], the quality of care that the patient receives is not affected by whether the abortion provider has admitting privileges at the hospital.' (citation to record omitted)

Expert testimony stating that in respect to surgical abortion patients who do suffer complications requiring hospitalization, most of these complications occur in the days after the abortion, not on the spot. (citation to record omitted)

Expert testimony stating that a delay before the onset of complications is also expected for medical abortions, as 'abortifacient drugs take time to exert their effects, and thus the abortion itself almost always

---

**8.** *Id.*

**9.** *Hellerstedt*, 136 S.Ct. at 2311, "(citing a study of complications occurring within six weeks after 54,911 abortions that had been paid for by the fee-for-service California Medicaid Program finding that the incidence of complications was 2.1%, the incidence of complications requiring hospital admission was 0.23%, and that of the 54,911 abortion patients included in the study, only 15 required immediate transfer to the hospital on the day of the abortion)."

occurs after the patient has left the abortion facility.' (citation to record omitted) Some experts added that, if a patient needs a hospital in the day or week following her abortion, she will likely seek medical attention at the hospital nearest her home. (citation to record omitted)". *Hellerstedt*, 579 U.S. ——, 136 S.Ct. at 2311.

¶ 13 The United States Supreme Court concluded that the "admitting privileges" requirement did not provide sufficient benefit to justify the undue burden it created for women seeking a lawful abortion. The evidence failed to support the arguments advanced on behalf of Texas. Instead, the medical statistics reflected how safe the procedure is and, further, that admitting privileges to a hospital have *no effect* on the quality of care the patient receives. Accordingly, the Texas legislation was found unconstitutional as it violated the Federal Constitution, Amdt. 14, 1. *Hellerstedt, supra.*

¶ 14 SB 1848 contains the same offending admitting privileges requirement examined in *Hellerstedt*. The record before us demonstrates that despite Burns' diligent efforts, he was unable to obtain admitting privileges to a hospital within 30 miles of his clinic. Burns applied to at least 16 different hospitals and either received no response or was rejected because: (1) he lacked board certification and/or (2) he was unable to meet the requirement of admitting the minimum number of six patients per year. Burns' medical specialty does not have a recognized board certification, making him unable to meet this qualification. During Burns' 41 years of private medical practice, he has only called for an ambulance one time. The patient experienced prolonged anesthetic effects. The patient awoke prior to the ambulance arriving. The patient was transported to a local emergency room for observation and released within three hours. Paradoxically his pristine medical record renders him ineligible under the hospital's yearly minimum inpatient admission requirement.

¶ 15 Burns' practice is licensed by the State Department of Health. Burns maintains extensive equipment and supplies to monitor and respond to any potential patient emergency as well as emergency protocols. Although Burns does not have admitting privileges at a local hospital, he maintains an agreement with a physician who has such an affiliation. Burns provides his patients with a telephone number where he can be reached 24 hours a day, and instructs his patients to contact him for any complications or concerns.

¶ 16 The Oklahoma State Medical Association ("OSMA") consisting of more than 4000 physician and medical student members opposed the adoption of this bill. OSMA indicated that this legislation interferes with the physician/patient relationship and does not reflect medical science or the best interest of the patient.

¶ 17 As written, SB 1848 would cause Burns' clinic to close, or he would risk criminal and civil penalties for failing to meet the hospital admission requirement. Burns is one of only two abortion providers in the state of Oklahoma.[10] Thus, if his clinic closes, the State of Oklahoma would be left with only one abortion provider in this state, leaving many Oklahoma women without services. Under the guidance of *Hellerstedt* and *Casey* this new legislation would have the effect of placing an undue burden on women seeking abortion services.

¶ 18 Defendants argue the impetus for this legislation was to advance and protect women's health. This same argument was considered and rejected in *Hellerstedt*. The national scientific evidence presented in *Hellerstedt* disputed such claims. The record evidence before this Court fails to persuade us that SB 1848 does anything to *advance* or *protect* women's health. In fact, the OSMA indicated this bill would have the *opposite* effect and specifically indicated that it *did not reflect the patient's best interest*. Furthermore, in 41 years of private medical practice, Burns has only called an ambulance one time for a patient who was simply observed and released from a local emergency room. We find there is no evidence to support defendants' position that this legislation protects and advances women's health.

10. Record, Joint Stipulations of Fact.

¶ 19 As in *Hellerstedt*, we reject defendants' argument and find that SB 1848 places a substantial obstacle in the path of women seeking a lawful abortion. We further find this legislation causes a significant reduction in abortion providers, creating an onerous burden to women of child-bearing age. Under the guidance of *Hellerstedt*, SB 1848 creates a constitutionally impermissible hurdle for women who seek lawful abortions.

## OKLAHOMA CONSTITUTION, ART. 5, 57, SINGLE SUBJECT RULE AND SB 1848

¶ 20 Next, we turn to the Oklahoma state constitution. Although the parties have raised and responded to multiple Oklahoma constitutional issues surrounding SB 1848, we limit our discussion to the single subject rule under art. 5, 57. We begin by examining the test to determine whether a law violates the single subject rule. Its terms provide:

"Every act of the Legislature *shall embrace but one subject*, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills and bills adopting a code, digest, or revision of statutes; and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length: Provided, That if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the law as may not be expressed in the title thereof." (Emphasis added). art. 5, 57, Oklahoma Constitution.

¶ 21 The purpose of the constitutional protection of the single subject rule is not to impede legislation, but rather to insure transparency in the legislative process.[11] This rule is to prevent the Legislature from making new legislation veto proof by incorporating unpopular legislation within popular bills.[12] The two main purposes of this rule are:

1) to ensure that the legislators or voters of Oklahoma are adequately notified of the potential effect of the legislation; and

2) to prevent 'logrolling', the practice of assuring the passage of a law by creating one choice in which a legislator or voter is forced to assent to an unfavorable provision to secure passage of a favorable one, or conversely, forced to vote against a favorable provision to ensure that an unfavorable provision is not enacted.[13]

¶ 22 This doctrine dates back to statehood.[14] The single subject rule safeguards against enacting legislation which, if introduced as a single bill, could never command the approval of a majority of the legislature.[15]

¶ 23 SB 1848 creates an entire new section of law comprised of twelve unrelated provisions subjecting abortion providers to added regulation and imposing significant penalties for simple violations. Section A of the new law grants the State Board of Health the authority to establish abortion facility supplies and equipment standards.

¶ 24 Section B of this legislation is one of the most troubling provisions, for the reasons previously identified under *Hellerstedt, supra*. On any day that an abortion is performed, the facility is required to have a physician *on premises* who has admitting privileges to a hospital within thirty miles of the facility. The physician "must remain on the premises of the facility to facilitate the transfer of emergency cases if hospitalization of an abortion patient or a child born alive is necessary and until all abortion patients are stable and ready to leave the recovery room." SB 1848 (B). This provision alone rendered this entire legislation void under our federal constitution.

**11.** *Fent v. Fallin*, 2013 OK 107, ¶ 4, 315 P.3d 1023, 1025 (citation omitted).

**12.** *Id.*

**13.** *Fent v. State ex rel. Oklahoma Capitol Improvement Authority*, hereinafter ("Oklahoma Capitol"), 2009 OK 15, ¶ 14, 214 P.3d 799, 804 (citations omitted).

**14.** *In re County Commissioners of Counties Comprising Seventh Judicial Dist.*, 1908 OK 207, 22 Okla. 435, 98 P. 557.

**15.** *Oklahoma Capitol*, 2009 OK 15, ¶ 15, 214 P.3d at 804–805. (citation omitted).

¶ 25 The remaining sections of the legislation provide as follows:

– Section C grants the State Board of Health the authority to adopt standards relating to the training of physician assistants in abortion facilities;

– Section D of SB 1848 directs the State Board of Health to create standards for the training of volunteers at abortion facilities;

– Section E empowers the State Board of Health to adopt minimum standards relating to the medical screening and evaluation of an abortion patient;

– Section F of this legislation relates to the State Board of Health adopting standards for the performance of abortions and related follow-up care;

– Section G provides for mandatory requirements for abortion facilities to report to the State Board of Health for injuries to the patient or a born-alive child injury;

– Section H requires reporting requirements in the event of a patient death;

– Section I identifies the agencies and professional licensing and regulatory boards with whom incident reports are to be filed;

– Section J imposes broad felony penalties against any person (1) operating an abortion facility without a valid license, (2) or who intentionally violates any provision of "this act or any standard adopted by the State Board of Health in accordance with this act . . .";

– Section K imposes civil penalties and guidelines for the enforcement thereof for "[a]ny violation of this act or any standards adopted under this act . . .". The State Board of Health is the designated agency for determining civil penalties; and

– Section L empowers the State Commissioner of Health to seek injunctive relief from the courts to enjoin "any acts or practices which constitute, or will constitute, a violation of this act . . .".

¶ 26 The State urges that SB 1848 survives the constitutional challenge as it does not violate the single subject rule. Specifically, defendants assert that SB 1848 has one common theme and purpose, "the establishment of standards for abortion procedures performed at abortion facilities".[16] The defendants acknowledge this legislation is comprised of multiple sub-parts, but incorrectly reason that they are germane and cognate.[17] Defendants next argue that because each sub-part relates in some way to abortion, this is enough to pass the constitutional muster under art. 5, 57 of the Oklahoma Constitution and avoid logrolling. Defendants argue that this Court only finds logrolling when an unpopular piece of legislation is included into popular legislation on a different subject, citing *Campbell v. White*, 1993 OK 89, 856 P.2d 255, and *In re Initiative Petition No. 382*, 2006 OK 45, 142 P.3d 400. Defendants' reliance on these two cases for this argument is unconvincing. The State also fails to fully acknowledge the scope of this Court's precedence and analysis on this point.

¶ 27 Legislation with multiple sections or provisions must be "germane, relative, and cognate" to a common theme and purpose.[18] In making such a determination, we have consistently found it is not enough to simply articulate some rational connection between similar or related provisions.[19] Our focus is "whether it appears that either the proposal is misleading or provisions in the proposal are so unrelated that many of those voting on the law would be

---

16. Record, Defendants' Response to Plaintiff's Motion for Partial Summary Judgment, ("Defendants' Response").

17. Record, Defendants' Response; "These subparts (sic.) include creation of: a standard requiring a physician with hospital admitting privileges to remain on the facility's premises during abortion procedures; standards for supplies and equipment; standards relating to the training of physician assistants and volunteers working at the facility; standards relating to the medical screening and evaluation of abortion patients; standards relating to the performance of abortion procedure and post-procedure follow-up; and certain reporting requirements.

18. *Oklahoma Capitol*, 2009 OK 15, 16, 214 P.3d at 805.

19. *Burns v. Cline, supra.; Oklahoma Capitol, supra.*

faced with an unpalatable all-or-nothing choice."[20]

¶ 28 SB 1848 contains multiple subjects that are not "germane, relative and cognate" to a common theme and purpose. This statute directs the State Board of Health to develop standards on (1) supplies and equipment, (2) training physician's assistants and volunteers, (3) medical screening and evaluation, and (4) abortion procedure and post-procedure follow-up care, (5) assigns record keeping and reporting requirements to the State Board of Health, (6) creates the hospital admitting privileges requirement, and (7) assigns felony as well as civil penalties for certain violations.

¶ 29 We reject defendants' arguments and find that the sections in SB 1848 are so unrelated and misleading that a legislator voting on this matter could have been left with an unpalatable all-or-nothing choice.[21] This legislation illustrates the reason for the enactment of the constitutional provision known as the single subject rule which was designed as a constitutional safeguard to prevent logrolling. At the heart of this rule is to insure that "each piece of legislation enacted is worthy of the approval of the voter...".[22] We hold that SB 1848 violates the single subject rule and also fails under our Oklahoma Constitution.

¶ 30 We therefore hold that SB 1848 is unconstitutional under both Oklahoma and federal law and is void. For these reasons the district court's order is reversed, and the matter is remanded for further proceedings consistent with this opinion.

**TRIAL COURT'S ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IS REVERSED; CAUSE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH TODAY'S PRONOUNCEMENT**

ALL JUSTICES CONCUR

---

20. *Burns v. Cline*, 2016 OK 99, ¶ 11, 382 P.3d at 1051, citing *Oklahoma Capitol*, 2009 OK 15, ¶ 15, 214 P.3d 799, 804–805.

21. *Burns v. Cline*, 2016 OK 99, ¶ 13, 382 P.3d at 1052; *Oklahoma Capitol, supra.*

22. *Burns v. Cline*, 2016 OK 99, ¶ 13, 382 P.3d at 1052.